Donald HORNER and Simuna Horner, as Parents and Natural Guardians for Donald HORNER, Jr., Petitioners,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–1445V.

United States Court of Federal Claims.

Feb. 9, 1996.

---

William J. Stapleton, Ann Arbor, Michigan, for petitioners.

Kate Adam Coleman, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for respondent.

## OPINION

YOCK, Judge.

This case is before the Court on the petitioners' motion for review of Special Master Richard B. Abell's September 29, 1995 [1] opinion dismissing the petitioners' claim under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa–1 through 300aa–34 (1988 & Supp. V 1993) (the "Vaccine Act" or the "Act"). After a review of the parties' respective submissions and the transcript from the hearing below, the Court grants the petitioners' motion for review and remands the case for consideration of the petitioners' purported vaccination record.

### Factual Background

The petitioners filed for compensation under the Vaccine Act on September 26, 1990, for injuries their son, Donald Horner, Jr. ("Donald") allegedly received as a result of a DPT (diphtheria, pertussis, and tetanus) vaccination administered on June 18, 1964. [2]

The petitioners' application for compensation under the Act claimed that Donald suffered a presumptively DPT-related residual seizure disorder and/or encephalopathy and/or shock collapse and/or hypnotic hyporesponsive collapse as defined in the Vaccine Injury Table within the applicable three-day time period. Specifically, the petitioners alleged that Donald received a DPT vaccination on June 18, 1964, and experienced Table symptoms the same day.

In response to the petitioners' application, the respondent filed a report, pursuant to Vaccine Rule 4 in Appendix J, recommending that compensation be denied on the basis that the medical records did not support the petitioners' claim. The respondent noted a lack of contemporaneous medical records documenting a DPT vaccination on June 18, 1964. Moreover, the respondent pointed out that the medical records that were presented contained very detailed descriptions of Donald's first seizure and the preceding events on June 18, 1964, but did not state that Donald received a DPT vaccination prior to the seizure. Citing references to penicillin injections for treatment of Donald's high fever and tonsillitis, the respondent concluded that if Donald received a shot on June 18, 1964, it was a penicillin injection, not a DPT vaccination.

Prior to conducting a hearing on whether Donald received a DPT vaccination on the alleged date, the special master issued several orders regarding production of medical records by the petitioners. On October 12, 1993, the special master issued an order for the petitioners to provide any previously unfiled medical records and to detail all efforts to obtain medical records. In response to this order, the respondent made a supplemental filing on December 8, 1993. The supplemental filing contained an affidavit from the petitioners' attorney that he was unable to obtain any records from Doctor Elliot, Donald's pediatrician, pertaining to his treatment of Donald as an infant. A June 3, 1994 Order from the special master informed

---

1. The same opinion was issued for publication on October 6, 1995.

2. The petitioners' original application did not include a specific date in June 1964 for the DPT vaccination. In subsequent filings, petitioners provided a date of June 18, 1964.

the parties that any documents they intended to rely on had to be filed before the hearing.

On November 15, 1994, the special master conducted an onset hearing in this matter, limited to the issue of whether a DPT vaccine was administered on June 18, 1964, or within the preceding 72 hours. Much of the testimony during the onset hearing focused on a receipt for $12 from Doctor Elliot's office dated June 18, 1964, signed by Nurse Brown, containing the initials "DPT" on a line titled "For Professional Services." Both Mrs. Horner and Nurse Brown testified at the hearing, and Nurse Brown provided a handwriting sample. Neither Mrs. Horner nor Nurse Brown claimed to have written "DPT" on the receipt. The special master compared Nurse Brown's handwriting from portions of the 1964 receipts and from her handwriting sample provided at the hearing to the letters "DPT" appearing on the June 18, 1964 receipt.

At the close of the hearing, the special master issued a bench ruling in favor of the respondent. In his ruling, the special master referred to the absence in the documents before him of the petitioners' vaccination record:

> We do not actually have any immunization records themselves. Although, curiously enough, Mrs. Horner admitted in her testimony that she thought that such existed, but she was not certain where or who had them. And the Court notes that. Does not draw any conclusions from it, but notes that.

The special master found that the petitioners failed to establish by a preponderance of the evidence that a DPT vaccination was administered on June 18, 1964, or 72 hours prior to the June 18, 1964 indicia as would be necessary to establish a Table case. As part of his ruling, the special master found that no one in Doctor Elliot's office wrote "DPT" in the section for professional services on the June 18 receipt.

One month after the hearing, on December 15, 1994, the petitioners informed the respondent that they had found the missing vaccine record in Donald's old school papers. The petitioners stated that the newly-discovered record appeared to show a DPT vaccination date of June 15, 1964. The petitioners provided a copy of the record to the respondent and asked the respondent to show the record to Doctor Elliot for his interpretation. The respondent objected to the introduction of the vaccination record. It is not known whether the record was ever shown to Doctor Elliot.

In an Order dated February 15, 1995, the special master declined to admit the purported vaccination record. In a September 29, 1995 opinion, the special master reaffirmed and expanded upon his earlier rulings. In refusing to consider the vaccine record, the special master stated:

> I find it fundamentally unfair to allow petitioners to file additional evidence after I have ruled from the bench adversely to their position and have found their credibility to be at issue. Petitioners were specifically on notice following the prehearing order that all exhibits were due prior to the hearing. This case was filed on 26 September 1990. All prehearing exhibits were due 1 November 1994. Petitioners had greater than four years to locate and file any purported immunization record. It is a fundamental duty of petitioners to file records in support of their claim. I cannot excuse this apparent lack of diligence. Were this court to allow such dilatory behavior, these cases would never come to completion. The court finds it particularly disturbing in this case where the court raised serious issues of credibility in regards to the petitioners' testimony and a previously filed receipt.

On October 30, 1995, the petitioners filed this appeal requesting that this Court reverse the special master's decision in two regards. First, the petitioners argue that the special master's refusal to consider the vaccination record was arbitrary and capricious and not in accordance with the principles of flexibility and fundamental fairness embodied in the Vaccine Act and rules. Second, the petitioners challenge the special master's determination that the letters "DPT" which appear on the June 18, 1964 receipt from Doctor Elliot's office were not

written by Doctor Elliot or any of his employees.

### Discussion

1. *Standard of Review*

The Vaccine Act provides that:

[T]he United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—

   (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

   (B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

   (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2).

The Act contemplates three distinct levels of review. "Fact findings are reviewed under the arbitrary and capricious standard. Legal questions are reviewed under the 'not in accordance with law' standard, and discretionary rulings are reviewed under the abuse of discretion standard." *Perreira v. D.H.H.S.*, 27 Fed.Cl. 29, 32 (1992).

2. *The Vaccine Record*

■ The petitioners challenge the special master's decision not to admit and consider the purported vaccination record. Rulings as to the admissibility of evidence are reviewed under the abuse of discretion standard. *Munn v. D.H.H.S.*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992). Under the abuse of discretion standard, a trial court is to be reversed for an error in interpreting law, or exercise of judgment on clearly erroneous findings of material fact, or irrational judgment in weighing relevant factors. *Chiu v. United States*, 948 F.2d 711, 713 (Fed.Cir. 1991).

The Vaccine Act provides that the United States Court of Federal Claims shall promulgate rules for special masters which:

   (A) provide for a less-adversarial, expeditious, and informal proceeding for the resolution of petitions,

   (B) include flexible and informal standards of admissibility of evidence,

   (C) include the opportunity for summary judgment,

   (D) include the opportunity for parties to submit arguments and evidence on the record without requiring routine use or oral presentations, cross examinations, or hearings and

   (E) provide for limitations on discovery and allow the special masters to replace the usual rules of discovery in civil actions in the United States Court of Federal Claims.

42 U.S.C. § 300aa–12(d)(2). Pursuant to the Vaccine Act, the Court of Federal Claims issued Vaccine Rule 8(b) regarding the admissibility of evidence:

In receiving evidence, the special master will not be bound by common law or statutory rules of evidence. The special master will consider all relevant, reliable evidence, governed by principles of fundamental fairness to both parties. Evidence may be taken in the form of documents, affidavits, oral testimony at a hearing in person or via telephone; or even, in appropriate circumstances, video tape. Sworn written testimony may be submitted in lieu of oral testimony.

The second sentence of Rule 8(b) establishes the lenient standard for admissibility: "The special master will consider all relevant, reliable evidence, governed by principles of fundamental fairness to both parties." In interpreting Rule 8(b), the Court is mindful of the Vaccine Act's mandates to "provide for a less-adversarial, expeditious, and informal proceeding" and to "include flexible and informal standards of admissibility." 42 U.S.C. § 300aa–12(d)(2). Moreover, the Court notes that the vaccine compensation system was designed to tilt toward petitioners so that "awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." *Johnston v. D.H.H.S.*, 22 Cl.Ct. 75, 77 (1990) (citing H.R.Rep. No. 908, 99th Cong., 2d Sess., pt. 1, at 3 (1986), *reprinted*

*in* 1986 U.S.C.C.A.N. 6287, 6344). Applying the admissibility standard of fundamental fairness, the Court must determine whether it was an abuse of discretion for the special master to have refused to reopen proof and consider the vaccination record.

■ The sole issue at the November 15, 1994 hearing was whether Donald received a DPT vaccination within 72 hours of his June 18, 1964 seizure or seizures. The best evidence as to the date of the vaccination, the vaccine record, was missing from the medical records. The special master specifically mentioned the absence of a vaccine record in his bench ruling. Moreover, the importance of contemporaneous medical records and the absence of them to support the petitioners' application were continuing themes in the special master's analysis. At the November 15 bench ruling in which he noted the absence of a vaccine record, the special master recognized the rule that "[i]n general, contemporaneous written records are to be given more weight than testimony used later from persons interested in the outcome." Consistent with this principle, special masters have frequently placed greater importance on medical records than parental testimony when the two have been in conflict. *See, e.g., Cucuras v. D.H.H.S.*, 993 F.2d 1525 (Fed.Cir.1993); *Burns v. D.H.H.S.*, 3 F.3d 415 (Fed.Cir.1993); *Estate of Arrowood v. D.H.H.S.*, 28 Fed.Cl. 453 (1993). Moreover, the Federal Circuit has recognized the special value of medical records as evidence:

> Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events.

*Cucuras,* 993 F.2d at 1528.

In this case, the petitioners offered the vaccine record after the special master held an onset hearing. The vaccine record is the best and strongest possible evidence as to the date of the DPT vaccination. The vaccine record may be the difference between the success and failure of the petitioners' claim.[3] In light of the critical importance of the record and the possibility of authentication, the Court finds that fundamental fairness requires that the special master determine whether the document is genuine and admit the document if he confirms its authenticity. How and when the vaccination record was found will have to be explored and weighed by the special master.

Although consideration of the vaccine record at this point is inconvenient, it is not fundamentally unfair to the respondent. First, the respondent will have an opportunity to challenge the vaccine record. If the respondent demonstrates that the record is not trustworthy, then it will not be admitted. Second, under the National Vaccine Injury Compensation Program, the respondent's interest is not to minimize payments to claimants but rather to see that only those who meet the statutory requirements for payment receive compensation. This interest is not harmed by consideration of the vaccine record for the purpose of determining the date of vaccination. Moreover, fundamental fairness requires a search for the truth, and this search will be furthered by examination of the newly found and offered evidence.

The special master stated in his opinion rejecting consideration of the alleged vaccine record that "[t]he court finds it particularly disturbing in this case where the court raised serious issues of credibility in regards to petitioners' testimony and a previously filed receipt." This Court does not share the special master's concern about credibility in regards to the vaccine record because Doctor Elliot, whose signature appears on the record numerous times, is apparently available to authenticate the document and explain its contents. At this point in time, before the document has been examined, it is too early to exclude the document based on reliability. There was no motivation for the petitioners

---

**3.** Of course, even if the petitioners were to establish a prima facie Table case, the respondent could still show by a preponderance of the evidence that there was another cause of the injuries. *See* 42 U.S.C. § 300aa–13(a)(1)(B). The respondent has already indicated that it will make this argument.

to withhold the record. To the contrary, its absence was fatal to the petitioners' case before the special master. In addition, if the petitioners had control over the content of the vaccine record, it seems unlikely that petitioners would have produced a document showing a vaccination date of June 15 rather than June 18.

Also in his opinion, the special master exhibited a valid concern that "[w]ere this court to allow such dilatory behavior, these cases would never come to completion." This frustration is understandable because the onset hearing might have been unnecessary had the petitioners produced the vaccine record earlier. In that event, the resources of all parties involved would have been used more efficiently than they have been in the present circumstances. Still, the importance of the vaccine record is sufficiently great that fundamental fairness requires consideration of it, even at substantial inconvenience to all the parties.

The vaccine compensation system is not the typical money-granting statute upon which parties usually come before this Court. The vaccine system is designed to be less formal than other civil litigation and to address the difficulty of proving events that occurred decades ago. Thirty years have elapsed between the alleged date of the vaccination and the hearing. Four years have elapsed from the date of the petitioners' filing until the hearing. The one month that expired between the special master's bench ruling and the petitioners' attempted introduction of the vaccine record is not so long as to make it fundamentally fair to shut the Court's eyes before what may be extremely probative evidence. It was an abuse of discretion for the special master, under the circumstances here present, not to reopen proof on the point and consider the newly-found and presented vaccination record.

### 3. *June 18, 1964 Office Receipt*

■ The petitioners also challenge, as arbitrary and capricious, the special master's determination that the letters "DPT" on the June 18, 1964 receipt from Doctor Elliot's office were not written by one of Doctor Elliot's employees. In support of their argument, the petitioners argue that Nurse Brown, who signed the receipt, was equivocal as to whether she wrote "DPT" on it, while Mrs. Horner was adamant that neither she nor anyone in her family wrote "DPT" on the receipt.

The amount of weight to give the testimony of these two individuals is an issue of credibility and is left to the special master. "[W]e do not examine the probative value of the evidence or the credibility of the witnesses. These are all matters within the purview of the fact finder." *Munn v. D.H.H.S.*, 970 F.2d 863, 871 (Fed.Cir.1992) (footnote omitted). "Such arguments as to the weighing of evidence, particularly where, as here, credibility is involved, do not demonstrate reversible error." *Hines v. D.H.H.S.*, 940 F.2d 1518, 1527 (Fed.Cir.1991). As such, a determination of credibility is virtually unreviewable. *Hambsch v. Department of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986); *Song v. D.H.H.S.*, 31 Fed.Cl. 61, 68–69, *aff'd*, 41 F.3d 1520 (Fed.Cir.1994) (Table).

Nevertheless, several observations are in order as to the significance of the challenged finding. First, the petitioners have changed the date on which they claim Donald received a DPT vaccination. The petitioners, after contending at least through the onset hearing, that Donald received a DPT vaccination on June 18, 1964, have now introduced evidence which indicates a vaccination date of June 15. Whatever the probative value of the June 18 receipt as evidence of a June 18 vaccination, its value as evidence of a June 15 vaccination is significantly less.

Second, the question of who wrote "DPT" on the June 18 receipt is a separate issue from whether that receipt was given for a "DPT" vaccination. It does not necessarily follow from the conclusion that Nurse Brown did not write "DPT" on the receipt that no DPT vaccination was given that day. Nurse Brown testified that it was not her practice to write the type of vaccine on a receipt. There is nothing contradictory about someone outside of Doctor Elliot's office writing "DPT" on the June 18 receipt and the administration of a DPT vaccination on that date. On the other hand, it does not necessarily follow from a determination that Nurse

Brown did write "DPT" on the receipt that a DPT vaccination was given on that date. Mrs. Horner testified that a receipt was sometimes given on a subsequent visit for services rendered on a previous occasion. Thus, the date of the receipt is not necessarily the date of the vaccination. Indeed, petitioners would presumably make this argument to reconcile the June 18 receipt with their newly-offered vaccination record appearing to show a vaccination date of June 15. Accordingly, even if this Court were to make its own factual finding as permitted by 42 U.S.C. § 300aa–12(e)(2), such a finding would be of limited use to petitioners.[4]

Finally, the documents currently before the special master make for a much different record than the one before the special master at the time of the November 15, 1994 onset hearing. Assuming that the special master finds the vaccine record to be reliable, new and highly probative evidence has been introduced, and the alleged date of the vaccination, the determination of which was the sole purpose of the November 15 hearing, has changed. In light of these developments, the special master should re-examine his finding regarding the letters "DPT" written on the June 18, 1964 receipt to incorporate the fundamental changes in the record since his ruling into his decision.

## CONCLUSION

Accordingly, based on the foregoing, this case is remanded to the special master with directions to reopen the proof to consider the admission of the newly-offered vaccination record and to make any necessary changes in his findings. Thereafter, since the parties may be satisfied with the opinion on remand, the Court directs the special master to file his decision within 90 days, without further intervention of this Court. Unless either party seeks a further motion to review the special master's reconsidered decision pursuant to 42 U.S.C. § 300aa–12(e)(1) and Vaccine Rule 11, the clerk of the Court shall enter judgment in accordance with the special master's finding.

cial master's reconsidered decision. 42 U.S.C. § 300aa–12(e)(3).

---

4. The Court does not by this statement express either agreement or disagreement with the spe-